Filed 4/8/15  In re E.C. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COPY

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sutter)

----

| | |
|---|---|
| In re E.C., a Person Coming Under the Juvenile Court Law. | C077277 |
| SUTTER COUNTY DEPARTMENT OF HUMAN SERVICES, | (Super. Ct. No. DPSQ-20136886) |
| Plaintiff and Respondent, | |
| v. | |
| J.C., | |
| Defendant and Appellant. | |

Mother, Jessica C., appeals the juvenile court's order denying her petition for modification, which sought reunification services.  She contends the trial court abused its discretion in denying her services because she had demonstrated changed circumstances and that the minor could benefit from services.  We disagree and affirm the juvenile court's order.

1

BACKGROUND

*Detention of Minor & Section 300 Petition*

On September 9, 2013, Yuba City Police Officer Maky arrested mother after conducting a search of her motel room. During the search law enforcement found two grams of methamphetamine and a hypodermic syringe. Both the syringe and the methamphetamine were accessible to the four-year-old minor. The room was filthy with clothing and trash piled around the room. The bed had been removed from the room due to nonpayment of rent, so mother and the minor were sleeping on the floor. There were also two dogs in the room. The minor's body, clothing, and hair were dirty and she emitted a foul smell of dirt and dogs. Officer Maky called the Sutter County Department of Human Services (the Department) and requested a social worker respond, because the minor needed placement. Mother admitted to the social worker that she had used methamphetamine that morning. The minor was placed in protective custody.

The Department had also been investigating a neglect referral since August 2013. As part of that investigation, mother advised the social worker she had been diagnosed as bipolar and schizotypal, although mother disagreed with the diagnosis. She stated she had a gift to heal that was misinterpreted as mental illness. Mother also suffers from trichotillomania, and is bald as a result of pulling her hair out.[1] She told the social workers the words "Believe" and "Jesus Christ" are being formed on her scalp. Mother admitted smoking marijuana. Mother and the minor had been homeless off and on for at least the last three years. When the minor was detained, mother did not have any realistic prospects to improve their housing situation. Mother previously had a number of short-lived jobs, but had not been gainfully employed

---

[1] Trichotillomania is an anxiety disorder distinguished by the compulsive pulling out of one's own hair and difficulty refraining from this behavior.

in the last three years. Mother's history with the Department included 15 referrals dating back to 1998, six of which pertained to the minor.

Mother had a history of significant mental health diagnosis and treatment. She had previously participated in services, but over time did not maintain her treatment or sobriety. Mother's criminal history included arrests and/or convictions for felony transportation/sales of controlled substance, resisting arrest, assaulting a police officer, battery on a former spouse, drunk in public, willful injury to a child, contempt of court, and violation of probation. Since the minor's birth, mother had been arrested four times.

Upon her release from custody on September 11, 2013, mother informed the social worker that the minor had the ability to communicate with an entity nobody else could see. Mother advised she was seeking mental health treatment and had been attending AA/NA meetings. She was also drug testing and visiting with the minor regularly. Many of the drugs tests were positive. Mother informed the social worker she had graduated from an outpatient drug treatment in 2007. She reiterated she had not had stable housing since 2011.

On September 11, 2013, the Department filed a petition under Welfare and Institutions Code section 300.[2] The petition alleged mother had failed to protect the minor based on her inability or failure to supervise the child, her willful or negligent failure to provide the child with adequate food, clothing, shelter or medical treatment, and her inability to provide regular care due to her mental illness, developmental disability, or substance abuse. (§ 300, subd. (b).) On September 26, 2013, the juvenile court found the allegations in the petition true and ordered mother to complete two psychological evaluations.

---

[2] Undesignated statutory references are to the Welfare and Institutions Code.

*Psychological Evaluations of Mother*

Mother underwent court-ordered psychological evaluations with Dr. Wilkenfield and Dr. Wuehler in October 2013 and November 2013, respectively. Dr. Wilkenfield diagnosed mother with bipolar disorder, moderate trichotillomania, anxiety disorder, and amphetamine and cannabis dependency, currently in remission. Dr. Wilkenfield reported mother's history included mental health counseling, on and off over the years, as an adult. Mother indicated she had started smoking marijuana in her senior year of high school, and quickly moved to smoking on a nearly daily basis. She first tried methamphetamine at age 19, and within a year was using it regularly. She completed drug rehabilitation in 2005 and remained sober for about a year, and then started using again.

Dr. Wilkenfield observed mother was not "flagrantly delusional" but was "disinclined to acknowledge responsibility for the circumstances that brought her and her daughter to the attention of CPS … ." Her test results indicated a "somewhat inflated sense of self-worth and a rather indifferent attitude toward the welfare of others." Poor impulse control is a hallmark feature of her personality style, and her history further suggested she was not "given to carefully considering the consequences of her behavior before she acts." Dr. Wilkenfield concluded "[w]hat was perhaps of greatest concern with respect to her ability to function in a parental role was how limited her appreciation appears to be of the potential detriment her chronically unstable lifestyle is likely having on her child's personality development. She shows a very limited understanding of the importance of consistency and stability to a child [the minor's] age, and she showed rather limited insight into the seriousness of her own mental health issues." Dr. Wilkenfield opined mother's mental illness could pose a serious risk to any children in her care, and her mood, symptoms, and deficits in judgment were likely exacerbated by her protracted history of drug abuse. He expected her mental illness would manifest "in terms of limitations in her ability to accurately perceive or to focus her attention on her

4

child's needs or to effectively assess the effects of her own frequently erratic behavior and unstable lifestyle" on the minor's emotional function and personality development.

Dr. Wilkenfield concluded mother could possibly benefit from reunification services, once she was stabilized with a psychotropic medication regimen. He noted she had never consistently complied with such a targeted regimen and her history gave reason for skepticism on whether she would comply with treatment. He concluded it was possible for her to reunify within one year, but without "prodding and ongoing support," she was likely to falter. He also stated she was "capable of 'talking a good game' and would be expected to start showing some positive changes within a few months of getting started in her drug and mental health treatment, but if she hasn't yet started doing what she is asked to by the Department and begun to show a pattern of consistent attendance at her meetings with her service providers . . . there would be little reason to believe she is going to turn things around." Dr. Wilkenfield's recommendations for services included the need for a psychotropic medication evaluation and ongoing treatment with the prescribing physician, individual psychotherapy with a therapist experienced with individuals with longstanding characterological dysfunction, completion of substance abuse recovery, and structured aftercare.

Dr. Wuehler evaluated mother in November 2013. He diagnosed her with schizoaffective disorder and a hair pulling disorder. Mother was not taking her prescribed psychiatric medication. Mother did not believe she needed any psychiatric medication, but self-medicated with marijuana. Mother told Dr. Wuehler she began using marijuana daily at age eight, stopped at age 13, resumed in her senior year of high school, and currently still uses. She also reported she had been using methamphetamine "on and off" since she was 19 years old, but had stopped using two or three years ago. Mother reported she had graduated from treatment programs in 2006 and 2007, and had an "uncompleted Prop 36." Dr. Wuehler noted from the records, mother had been diagnosed with a mental disorder since at least 2004, and her compliance with treatment,

5

including psychiatric medication, had been variable, but generally poor.  Dr. Wuehler opined, as a result of her mental disorders, mother was presently unable to adequately care for and control her child.  He concluded, based on her mental disorders, it was unlikely mother would be able to benefit from reunification services within the statutory period.  He noted she did not believe she had a problem which needed changing.  Dr. Wuehler did not believe after almost 10 years of attempts, mother would now "suddenly . . . do an about face, admit she has mental problems, comply with treatment and take appropriate medication."  "The likelihood of true benefit from reunification services is predictably poor."  To the extent the court ordered reunification services, he concluded it would be necessary for her to accept and take appropriate prescribed psychiatric medication, consistently and regularly attend psychotherapy, and attend regular NA meetings.  Dr. Wuehler also stated, "Given the almost ten years of mental health attempts to provide treatment, and recognizing [mother] has likely had mental/emotional problem [*sic*] as far back as age thirteen, it is opined that services in this case will require at least two years of consistent treatment before one could comfortable [*sic*] opine that she does not present a substantial risk to her child."

Mother obtained an evaluation by Dr. Franklin in January 2014.  Dr. Franklin diagnosed mother with a co-occurring disorder of substance abuse and a mood disorder.  Dr. Franklin concluded, based on mother's present mental health diagnosis, she was not able to provide for herself and the minor, and her test results indicated it "would be challenging at best for [mother] to care for her daughter."  Mother reported she became addicted to alcohol when in middle school, and started using methamphetamine and marijuana at age 18.  In 2005 she began self-medicating with methamphetamine, alcohol, and marijuana.  She reported she later "sobered up."  Mother also reported she was attending AA meetings and parenting classes, and had enrolled in community college.  She indicated she had been sober for 120 days and had never attended a formal substance abuse treatment program.  Dr. Franklin noted that without treatment, mother's mental

6

disorder would impact her ability to care for her daughter. Dr. Franklin opined mother's substance abuse and mental health diagnosis required medication and treatment to address her inability to provide a supportive living environment for the minor. Dr. Franklin concluded unless mother's current mental health diagnoses were addressed and managed, she would be unable to successfully reunify.

*County Reports Regarding Mother's Condition*

By November 21, 2013, mother was attending AA/NA meetings and stated she had "no desire to drink or use drugs." She claimed she had been clean for over 60 days, but between September 2013 and November 15, 2013, mother tested positive for marijuana in 26 out of 28 drug tests. Between November 18, 2013 and December 12, 2013, seven of mother's nine tests were positive for marijuana. Of mother's four drug tests between December 2013 and January 2014, three were negative. Since December 2013, she had attended numerous AA/NA meetings. In January 2014, mother had found and attended a parenting class.

Dr. Singh prescribed psychotropic medications on October 23, 2013, and as of November 19, 2013, mother had not started taking them, because she did not feel she needed them. In a follow up appointment with Dr. Singh, at the end of November 2013, mother stated she did not want to take the medication, questioned her need for it, and challenged her bipolar diagnosis. She also refused to sign the treatment plan and the medication consent. Intervention counselor Karen Handy advised that mother was not appropriate for drug treatment until her mental health issues stabilized. As of January 2014, mother was still not taking the medication prescribed by Dr. Singh, because "my god tells me not to."

Mother had been consistent in her visits with the minor and could be loving and affectionate toward the minor during these visits. Mother also sometimes asked the minor too many questions or gave her information that was not appropriate for a four year old. When mother asked the minor too many questions, the minor would withdraw,

which in turn caused mother to be suspicious. A number of visits were cancelled due to positive drug tests.

*Post-Placement Status of the Minor*

About a month after she was detained, the minor was placed with her relatives, James B. and B.J.. During an October 28, 2013 visit, the minor told mother she did not want to leave James B. and B.J. that day. When mother asked, "Then what about your visit with mommy," the minor stated, "I don't know." During the next visit, the minor referred to B.J. as "mommy." Mother had an extended discussion with the minor stating that B.J. was not her mother. The minor was upset that she had gotten into trouble for calling B.J. "mommy."

The minor also underwent a mental health assessment, which indicated she needed mental health services. The foster parents, relative caregivers, and social workers noted she had "poor boundaries, frequent tantrums, poor public social skills, mood swings, aggressiveness, self-injuring, and pestering." The relative caregivers expressed a desire to adopt the minor. The minor was happy and content in her placement with her relatives, and they had a strong commitment to providing her a permanent, stable, and secure home.

In December 2013, the minor began Head Start and "loves it." She had no behavioral concerns at school, and her tantrums had decreased in severity and frequency. She had developed a better understanding of boundaries and better ability to cope with her emotions when she was feeling upset. The Department noted the minor had benefitted from living with the relative caregivers in an emotionally secure environment. The minor was stable and appeared happy, as evidence by the social worker's observations, and the minor's decreased behavioral problems.

During a telephone conversation between mother and the minor on January 20, 2014, the minor called her caregiver "dad." Mother was upset, and told the minor the caregivers were not her real parents, and informed the minor she would be back with

8

mother in a couple of weeks. After the phone call the minor's tantrums increased in frequency and severity, she refused to utilize her previously learned coping exercises or time-outs, she was hitting kicking and scratching herself and others, pulling her own hair, throwing objects, and ripping her clothing. Following an appointment with her mental health therapist, her tantrums subsided. During visits with mother, the minor was observed utilizing her coping exercises to manage frustration.

*Denial of Reunification Services for Mother*

In November 2013, the Department recommended mother should not be provided reunification services, as there was evidence that, even with services, she was unlikely to be capable of reunifying within the specified time limits. The social worker noted the minor was exhibiting "concerning behavior and needs to be in a stable environment, free from untreated mental illness." The social worker acknowledged mother loved the minor and they had a bond. "Unfortunately [mother's] mental illness and long-standing pattern of dysfunctional behavior prevents her from being capable of providing [the minor] a safe and stable home now or in the foreseeable future." Accordingly, the Department recommended no reunification services be offered and that a section 366.26 hearing be set.

The Department continued to recommend services be denied as of January 2014. Mother's mental illnesses rendered her unable to benefit from services, and she had refused to follow the recommendations of six trained mental health professionals. The Department was concerned mother's behavior would cause the minor's "anxiety to increase and her behaviors to deteriorate."

At the January 28, 2014, disposition hearing, mother testified she could benefit from services because she had been sober for 138 days, had begun a parenting class, and an alcohol dependency class. She was attending AA meetings regularly and had become a full-time college student. She testified the only thing she had not obtained yet was housing. She continued to believe it was not necessary for her to take medication,

9

because she was not having mood swings. She testified she was still unwilling to take psychiatric medication because of her relationship with God, and her God told her not to.

Minor's counsel noted the minor was doing very well in her caregiver's home. She was well taken care of and happy. Counsel noted her demeanor was much different than when he first met her at the beginning of the proceedings. She was now much friendlier and happier.

Mother's counsel argued mother had become clean of all substances, and was functioning in "every other single way that we like to see parents function other than the fact that she hasn't found a home at this time." Counsel argued in spite of the expert medical opinions, mother had been able to get clean without the benefit of psychiatric medication and was having good success in her counseling. Counsel argued mother had made drastic, life altering, changes and on that basis should be offered services. Counsel continued that her success over the preceding 138 days demonstrated she did not necessarily need medication to benefit from services.

The juvenile court noted the progress mother had made in terms of her enrollment in school, improvements in her social circle, and her sobriety. The juvenile court noted she had made good progress in benefiting herself, but not necessarily consistent with what would benefit the minor in terms of reunification. The juvenile court observed all three psychological evaluations indicated mother would need extensive therapy and medication to have any long-term, meaningful, benefit and progress that would result in the return of the minor to her. Over the course of 25 years, medical professionals have consistently stated mother needed medication, prescribed that medication, and mother has consistently not taken that medication. The court made it "abundantly clear" that it was "very, very concerned about this issue of the medication and whether or not [mother] would be willing to follow the recommendations of the professionals [she] had been seeing." The court also recognized mother believed she could benefit from services without medication, but the psychological reports and her history indicated otherwise.

10

The juvenile court followed the Department's recommendation, and denied reunification services based on mother's mental disability, which prevented her from being able to care for the minor and from benefitting from reunification services.

*The Department's Pre-Termination Report*

The July 15, 2014 section 366.26 report noted that the minor had several violent behavioral incidents in her pre-kindergarten program. She had bitten four children and had her hands wrapped around the throat of another. She had also been violent with her teacher. The minor had severe emotional and behavioral issues, which included hurting herself. She started therapy in December 2013 and had made progress. Her caretakers reported she no longer pulled out her hair or hurt herself, although she continued to act violently against others. There was an increase in violent behaviors following visits and phone calls with mother. In July 2014, the minor was referred to a higher level of therapy based on her aggressive behaviors in school. In August 2014, the social worker observed a bonded and loving relationship between the minor and her caretakers. The minor was excited and happy. She reported on her summer and their family activities. She referred to her caretakers as mom and dad and stated she liked living with them.

The minor had been living in the caretaker's home for 10 months and appeared bonded and comfortable in the home. Visits with mother continued to be supervised. The minor appeared to lose interest in mother's conversations and would try to get away from her. Their conversations would upset the minor and mother did not "acknowledge or notice the confusion and emotional upheaval this caused" the minor. The caretakers reported the minor had an increase in behavioral problems after her visits.

*Mother's Petition to Modify & Termination of Parental Rights*

On July 17, 2014, mother filed a section 388 petition requesting the court change its order that mother be bypassed for services based on changed circumstances and the best interests of the minor. Mother stated she had been clean and sober for "an extended period of time," had a home and income, and was in counseling. Mother had been

11

approved for social security benefits based on her mental illness. She received a significant social security payment and purchased a motor home, which is her primary residence. Mother had permission to park her motor home on Ms. Trisch's property, and utilize the utilities. She did not pay rent, but helped with Trisch's household bills. The property had no accommodations for sewer disposal, so mother had to take the motor home to a disposal facility in order to use the sinks and bathroom of the motor home. Mother is allowed to use Trisch's bathroom and connect the motor home to Trisch's electricity. The Department did not have information on Trisch's criminal or child welfare history, and the Department was unable to verify the safety of the location where mother was parking the motor home.

Mother stated she had been drug tested regularly by Sutter County probation, but rescinded her release of authorization, so the probation officer could not exchange information with the Department. Mother claimed her current therapist believed mother could care for the minor. She stated it was in the minor's "best interests to be raised by her mother with whom she has a long term, loving and previously stable relationship." Mother provided a copy of individual progress notes written by Dr. Epstein of Sutter Yuba Mental Health, dated July 9, 2014. Mother revoked her release of authorization with Sutter Yuba Mental Health, so the Department was unable to obtain any additional information regarding Dr. Epstein's service or the extent of his familiarity with mother's complete mental health history. Mother provided an individual progress note dated December 18, 2013, by Dr. Jaurigue. The note concluded there was no basis to begin medication at that time. Dr. Jaurigue, however, informed the social worker he could not be certain that mother did not need medication as he needed additional information. Sutter County probation referred mother to Donna Brown, a substance abuse counselor at Sutter Yuba Mental Health. Brown is not a licensed therapist.

Mother argued she had been clean and sober for 11 months, had obtained housing in the last several months, had income in the form of social security, acquired a vehicle,

12

and had started school. Mother also noted she was currently in therapy and her therapist did not believe she needed medication. Mother argued she was being provided services from Sutter Yuba Mental Health as a condition of probation, in addition to seeing her therapist. Mother did not present evidence of any specific reports from mental health professionals at Sutter Yuba Mental Health, but argued she was complying with probation, and Sutter Yuba Mental Health indicated they had evaluated her and were providing the necessary services. Mother also argued the evaluations were no longer indicative of her current status, because at the time she was not sober. Accordingly, mother argued since she was now sober, she no longer had a dual diagnosis and there would be other treatment options available to her. Mother acknowledged she had not presented any evidence on that point, or an evaluation suggesting she no longer needed medication. Mother argued the allegations which led to detention were related to her drug addiction, and claimed that mental health concerns might have been addressed because she was now sober. She again acknowledged there was no evidence to support that claim.

As to the best interests of the minor, mother argued there was an "accepted position that the child is, generally speaking, better off with a family member or certainly the parent." Mother also argued there was no indication that services would be detrimental to the minor. The minor had lived with mother for four years, and had only been out of mother's custody for 11 months. Mother argued that at the time of detention, the minor had a very loving and secure relationship with her. Mother did acknowledge that the minor had been provided a stable home with the relative caretakers for 10 months. Mother maintained, however, that it was in the minor's best interests to be "placed with her mother who we have no information that she is likely to have any further issues with her sobriety and is currently working on the mental health issues that may still exist."

13

The Department argued mother's circumstances were changing, but not changed. Mother had not presented any credible evidence to demonstrate she had the ability to benefit from services and could safely care for the minor. The primary reason reunification services were denied related to mother's mental health problems. Those issues remained unaddressed. The Department noted mother had documented mental health issues since 1987, and admitted drug use since she was a teenager. Mother's therapist was a substance abuse counselor, not a mental health therapist. Minor's counsel also noted that probation's focus was different than that in a dependency court. They were not focused on the child.

The Department argued the focus was now on permanence and stability for the minor. The minor had never been returned to mother since detention in September 2013. She had lived with her current caretakers since October 2013. As of January 2014, mother's visitation was reduced to one hour a month. The visits were always supervised, and the quality of the visits was questionable. The minor was observed to be withdrawn and upset when interacting with mother. After visits she was easily able to separate from mother and would frequently regress behaviorally. The minor's placement was stable, she was bonded to her relative caretakers, and she looked to them for her day-to-day care and necessities. Indeed, minor's counsel also reported the minor appeared bonded with the relative caretakers, her needs were being met, and she was happy and well taken care of.

The juvenile court noted previous psychiatric evaluations had concluded mother had distorted perceptions about love and connection, which the juvenile court found particularly troubling in terms of mother's ability to understand her parental role with the minor and to differentiate between her needs and the minor's. The juvenile court also noted all three psychiatric evaluations, and the evaluations going back 25 years, stated mother needed medication—which she testified she was unwilling to take. The juvenile court noted there had been no change as to those concerns. The juvenile court found

14

mother had made significant changes and was perhaps in the process of making some other changes, but found there was no evidence mother had overcome her distorted perceptions of love and connection. This point was particularly relevant in mother's assessment of the strength of the bond between her and the minor. The court did not believe their bond to be what mother perceived it as, and agreed mother lacked insight in terms of the minor's needs. Furthermore, the court noted visits between mother and the minor were challenging and frequently the minor would be upset by the conversations during the visits. Mother did not acknowledge or notice the confusion or emotional upheaval her actions caused the minor. The caretakers reported the minor had increased behavior problems after visits. The court found it was irrefutable mother had a very serious problem with addiction and a mental health diagnosis reaching back 25 years. The court also found there was no evidence that her sobriety had "cured" her underlying mental health diagnosis, so there was a lack of evidence of changed circumstances. There was no indication that the probation services were adequate to address the underlying causes that brought the matter to the dependency court. Mother had not demonstrated any ability to work with the Department, she had 25 years of documented psychological problems and drug and alcohol abuse, and there was no evidence that without targeted treatment her current sobriety would be sustainable. Accordingly, the juvenile court denied mother's section 388 petition. The minor was found adoptable and parental rights were terminated.

## DISCUSSION

Mother contends the juvenile court abused its discretion in denying her section 388 petition. She contends she demonstrated changed circumstances, specifically "her ability to maintain sobriety and her success in finding suitable housing." She also claimed reunification services were in the minor's best interests as she had been consistent in her visitation, she had raised the minor for the first four years of her life, and mother was loving and affectionate toward the minor.

15

Under section 388, a parent may bring a petition for modification of any order of the juvenile court based on new evidence or a showing of changed circumstances. "The parent requesting the change of order has the burden of establishing that the change is justified. [Citation.] The standard of proof is a preponderance of the evidence." (*In re Michael B*. (1992) 8 Cal.App.4th 1698, 1703.) "A section 388 petition must show a change of circumstances and that modification of the prior order would be in the best interests of the minor child. [Citations.] To support a section 388 petition, the change in circumstances must be substantial. [Citation.]" (*In re Ernesto R*. (2014) 230 Cal.App.4th 219, 223.) "Determination of a petition to modify is committed to the sound discretion of the juvenile court and, absent a showing of a clear abuse of discretion, the decision of the juvenile court must be upheld." (*In re S.R.* (2009) 173 Cal.App.4th 864, 870.) "Not every change in circumstance can justify modification of a prior order. The change in circumstances must relate to the purpose of the order and be such that the modification of the prior order is appropriate." (*Ibid.*)

Here, mother did not establish changed circumstances. In January 2014 when reunification services were denied, mother stated she had been sober for 138 days, had begun a parenting class and an alcohol dependency class, was attending AA meetings regularly, and had become a full-time college student. She was not taking her prescribed psychiatric medication and was unwilling to do so. Thus, the only changes alleged from the time when reunification services were denied, were that she had allegedly been sober for 11 months, since August 2013, and now had a home.

From the earliest stages of the proceedings, mother stated she was seeking mental health treatment and attending AA/NA meetings. She started using marijuana and methamphetamine as a teenager, and used both regularly for years. She completed at least one drug rehabilitation program, had periods of sobriety, and went back to using drugs. She admitted using drugs to self-medicate. Throughout the proceedings mother self-reported periods of sobriety that were belied by numerous and repeated positive drug

tests. Mother did not submit any drug tests to demonstrate her sobriety since January 2014. However, between September 2013 and December 2013, mother had 34 positive drug tests. Mother refused to allow the Department to obtain additional information with regard to any mental health treatment or counseling she had received since the disposition hearing. Mother presented no evidence that she no longer needed medication or that she could benefit from the provision of services without such medication. In the face of mother's long-term addiction problems, which had included temporary periods of sobriety, an undocumented claim that mother had been sober for approximately six months did not create a changed circumstance. (*In re Ernesto R., supra,* 230 Cal.App.4th at p. 223.)

The stability of mother's housing depended on the grace of Trisch in allowing mother to park her motor home on her property and utilize her electricity and her bathrooms. Although she could park on Trisch's property, because there was no sewage disposal on the property, mother could not utilize the sink or bathroom of the motor. Furthermore, there was no information on Trisch's criminal or child welfare history. Mother's procurement of basic housing was not a sufficiently changed circumstance, when the safety and stability of that housing remained uncertain.

In the over 10 years since mother was diagnosed with a mental illness, she has undergone counseling sporadically. As a part of the treatment for her mental illness she has been prescribed various psychiatric medications. But she has never maintained a significant period of compliance with that medication. Each psychiatric evaluator concluded mother would need psychotropic medication and ongoing mental health treatment, in addition to completing a substance abuse program, in order to benefit from reunification services. Mother provided no evidence to rebut these conclusions. Mother had not started taking psychiatric medication and, in fact, maintained her refusal to do so.

Mother also failed to meet her burden to establish that ordering reunification services would be in the minor's best interests. "To understand the element of best

17

interests in the context of a 388 petition filed, as in this case, on the eve of the.26 hearing, we turn to the Supreme Court's language in [*In re*] *Stephanie M*. [(1994)] 7 Cal.4th 295: '[A]t this point "the focus shifts to the needs of the child for permanency and stability" [Citation.] . . . . A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child.' (*Stephanie M., supra*, 7 Cal.4th at p. 317; see *In re Edward H*. (1996) 43 Cal.App.4th 584, 594 [on eve of the .26 hearing, children's interest in stability was court's foremost concern and outweighed any interest in reunification].)" (*In re J.C*. (2014) 226 Cal.App.4th 503, 526.)

The minor had lived with her relatives in a stable home for almost a year. She was happy and bonded to them. She referred to them as mom and dad and liked living with them. Her demeanor had improved during the proceedings, and she was friendlier and happier. The minor exhibited some serious emotional and behavioral problems, but had made progress through therapy. During that time, visits with mother remained supervised. During some of these visits the minor appeared to lose interests in mother's conversation and would try to get away from her. Mother's disagreement with how the minor referred to her caregivers, and herself, was visibly upsetting to the minor. Frequently after visits and phone calls with mother, the minor regressed behaviorally and had increased episodes of violence. Mother's failure to recognize or acknowledge that she was causing the minor to be upset or confused was consistent with Dr. Wilkenfield's conclusion that mother's mental illness could pose a serious risk to any child in her care. Dr. Wilkenfield had specifically warned that because mental illness affects mother's mood and causes deficits in her judgment, it could affect her ability to accurately perceive or focus on her child's needs. Mother's failure to recognize that her visits were negatively impacting minor was also consistent with Dr. Franklin's concerns about mother's distorted perceptions about love and connection, her ability to understand her parental role with the minor, and to differentiate between her needs and those of the

18

minor.  In this case, "[g]ranting a section 388 petition would delay selection of a permanent home and not serve the child's best interests."  (*In re Ernesto R.*, *supra,* 230 Cal.App.4th at p. 224.)

DISPOSITION

The order of the juvenile court denying mother's petition for modification is affirmed.


                                                            \_\_\_\_\_RENNER_____, J.


We concur:


\_\_\_\_BLEASE_____, Acting P. J.


\_\_\_\_HULL_____, J.